**IN THE UNITED STATES OF DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____

In re BLACK FARMERS DISCRIMINATION          )
LITIGATION                                                       )
                                                                         )
_____     )     Misc. No. 08-0511 (PLF)
                                                                         )
This document relates to:                             )
                                                                         )
ALL CASES_____)
_____

ROBINSON, JEREMIAH                              :
5720 Highway 425                                      :
Pine Bluff, AR 71601                                  :

       and                                              :

SHAWNEE KNOTT                                    :
3701 Hillcrest Street                                   :
Pine Bluff, AR 71603                                  :

       and


LONNIE BLOCKER                                   :
4955 Lee Road                                           :
Moro, AR 72368                                         :

       and                                              :

SAUNDRIA CONEY                                 :     Civil Action No._____
4955 Lee Road 119                                    :
Moro, AR 72368                                         :

       and                                              :

ERIC WEST                                                :
6426 S. Highway 159                                  :
Eudora, AR 71640
       and                                              :
ROBERT TROTTER                                   :
P.O. Box 422                                              :
Star City, AR 71667                                    :
       and                                              :

1

LAFEYETTE WOODS                          :
903 Fairway Drive                        :
Pine Bluff, AR 71603                     :

     and                                  :

KATHLEEN WILSON, Deceased                :
C/O JEFF WILSON, P.R.                    :
P.O. Box 304                             :
West Memphis, AR 72303                   :

     and                                  :

MAGDALINE BOATMAN                        :
325 South 21 Street                      :
West Memphis, AR 72301                   :

     and                                  :

ALLEN KNOTT                              :
2302 Reeker Street                       :     Civil Action No._____
Pine Bluff, AR 71601                     :

     and                                  :

JOHN SWIFT, Deceased                     :
C/O TERRY LYNN GRIGSBY                    :
120 Birch Road                           :
Star City, AR 71667                      :

     and                                  :

NEELY VANCE, Deceased                    :
C/O ALFRED VANCE                         :
106 Friendswood Drive                    :
Pine Bluff, AR 71603                     :

     and                                  :

VERGIE PEACOCK                           :
P.O. Box 1583                            :
Cleveland, MS 38732                      :

     and                                  :
JAMES WARE                               :
1021 East Broadway Street                :
West Memphis, AR 72301

2

```
                    and                          :

KIM WARD                                         :
806 South Street                                 :
P.O. Box 20101                                   :
White Hall, AR 71612                             :


                    and                          :

WALTER BURTON                                    :
624 Eastern Avenue                               :
Bellwood, IL 60104                               :


                    and                          :     Civil Action No._____

FREDDIE NEELY                           :
8 Bear Trail Cove                                :
Little Rock, AR 72210                            :


                    and                          :

CASSANDRA NEELY                                  :
8 Bear Trail Cove                                :
Little Rock, AR 72210                            :


                    and                          :

TURNER GRIGSBY, JR.                              :
11 Forest Maple Court                            :
Little Rock, AR 72223                            :


                    and                          :

ELMER DANZY                                      :
2003 W. Saracen Street                           :
Pine Bluff, AR 71601


                    and

ALBERTHA MAZIQUE
1540 Bellmoor Avenue
Pine Bluff, AR 71601                             :


                    and

ALBERTEEN MAZIQUE
`540 Bellmoor Avenue
```

3

Pine Bluff, AR 71601

ON BEHALF OF THEMSELVES AND          :
ALL OTHERS SIMILARLY SITUATED        :

       Plaintiffs,          :


    v.          :

ED SCHAFER, Secretary          :
The United States Department of Agriculture          :
14th and Independence Avenue, SW          :
Washington, DC 20250          :

      Defendant.          :


**CI,ASS ACTION COMPLAINT FOR DAMAGES, AND OTHER RELIEF"**

The representative and individual plaintiffs listed in the caption ("plaintiffs"), on behalf of themselves and all others similarly situated, complain of defendant as follows:

**NATURE OF THE CASE**

The US. Department of Agriculture ("USDA") administers nationwide programs to provide loans and benefits to farmers. During the period from 1981 through 1996, USDA discriminated against African-Americans who were farming or attempting to farm by unfairly and arbitrarily denying them the opportunity to fully participate in these programs. When, in response, plaintiffs complained to USDA about this treatment, the agency failed to properly account for, investigate, process, or resolve the civil rights complaints. As a result of this twofold violation of their civil rights, African American farmers suffered substantial damages.

In the consolidated cases of *Pigford, et al. v. Glickman*, Civil Action No. 97-1978 (PLF) (D.D.C.) and *Brewington v. Glickman*, Civil Action No. 98-1693 (PLF) D.D.C.) (the *"Pigford* case"), African-American farmers challenged USDA's discriminatory administration of farm loan and benefit programs and its abject failure to resolve their civil rights complaints. The cases were resolved when the

4

parties entered into a landmark class action settlement agreement that established an adjudicatory process for *Pigford* class members to prosecute their civil rights claims. Under the consent decree between the parties entered on April 14, 1999, over 15,000 class members have prevailed in adjudications and received compensatory damages, injunctive relief, and discharge of debt for the violation of their civil rights.

The terms of the *Pigford* consent decree and court orders implementing the class action settlement in the *Pigford* case generally limited relief to those class members who submitted claim forms on or before October 12, 1999; although, under section 5(g) of the consent decree, if a class member could show that the failure to submit the claim before the deadline was due to extraordinary circumstances beyond his or her control, the class member could file the claim late.

65,991 individuals petitioned for leave to file a late claim under section 5(g) of the *Pigford* consent decree. 2,699 petitions were approved and the remaining 63,292 individuals were denied the opportunity to file claims.

Congress held hearings on the unsuccessful section 5(g) petitions to file late claims and determined that good cause exists to give the petitioners, if they meet the *Pigford* case class definition, the right to file civil actions in federal court to obtain a determination of their *Pigford* claims. As a result, Congress included a provision, section 14012, in the recently-enacted Food, Conservation, and Energy Act of 2008 (the "2008 farm bill") establishing that right of action.

Section 14012 sets up a fund of $100,000,000 to cover all damages awarded under its provisions. $100,000,000 will not be sufficient to fully pay all damages awarded under section 14012 to the thousands of *Pigford* claimants who likely will file claims.

This action seeks relief for persons eligible to pursue their *Pigford* claims under section 14012 ("section 14012 claimants") and preservation of the $100,000,000 limited fund until it can be appropriately disbursed among successful section 14012 claimants.

**JURISDICTION**

5

1.      Jurisdiction is founded on section 14012(b) of the Food, Conservation, and Energy Act of 2008 (_ Stat. _; _ U.S.C. § ____); 7 U.S.C.. § 2279 note; 15 U.S.C. § 1691 et seq.; 5 U,S,C.. § 706; 28 U.S.C. § 1331; 28 U.S.C.. § 1343; and 28 U.S.C. § 2201.

## VENUE

2.      Venue lies in this judicial district because the plaintiffs' claims arose in this judicial district, and pursuant to 28 U.S.C. § 1391 (e) and section 14012(b) of the 2008 farm bill.

## PARTIES

### Parties

3.      Plaintiff and proposed class representative, Jeremiah Robinson, is an African- American farmer and  resident of Lincoln County, Arkansas. Mr. Robinson meets the *Pigford* case class member eligibility requirements.

4.      Mr. Robinson is 44 years old and farmed most of his life in Lincoln County, Arkansas. He and his siblings and grandparents, were cotton and soybean farmers. They farmed and raised cotton and soybeans on 40 acres of land. In 1982 Mr. Robinson joined the U. S. Army, where he served for s period of 3 years.

5.      Upon returning from the U. S. Army in 1985, Mr. Robinson applied for a farm operating loan from the Lincoln County FmHA and Farm Service Agency (FSA) office. The loan was denied. Mr. Robinson applied for farm operating loans in 1986 and 1987, again Mr. Robinson was denied.

6.       USDA's refusal to provide farm operating loans severely affected Mr. Robinson's ability to farm and raise cotton and soybeans because he did not have adequate funds to pay for crop production expenses and to maintain his land. As a result, plaintiff has had to reduce his farm operation from 40 acres to 5 acres.

7.      USDA approved farm operating loans to white farmers similarly situated to Mr. Robinson during the years 1985, 1986 and 1987..

6

8.     USDA's denial of loan to Mr. Robinson was racially motivated.

9.     Mr. Robinson repeatedly complained to the Lincoln County FmHA/FSA office that he was being discriminated against on the basis of race during the years 1985 to 1987. His complaints were ignored and were never processed, investigated or resolved.

10.    Due to circumstances beyond his control, Mr. Robinson did not file a timely claim under the *Pigford* consent decree. He filed a petition under section 5(g) of the consent decree for leave to submit his claim after the October 12, 1999 deadline. The Arbitrator under the *Pigford* consent decree denied his petition.

11.    Mr. Robinson seeks to have his *Pigford* claim determined under the expedited resolution process set out in section 14012(f) of the 2008 farm bill.

12.    Plaintiff and proposed class representative, Shawnee Knott, is an African-American farmer and resident of Pine Bluff, Jefferson County, Arkansas. Ms. Knott meets the *Pigford* case class member eligibility requirements.

13.    Ms. Knott farmed with her family on 106 acres in Jefferson County, Arkansas. They raised soybeans, wheat.

14.    Ms. Knott applied for farm operating loans on two occasions in 1994 and 1995 at the FmHA. office in Pine Bluff, Arkansas. Each time the loan was denied. She and her father applied for a loan to purchase a tractor. The application was denied.

15.    Ms. Knott's ability to farm was hindered by USDA's refusal to provide loan funds. She and her father could not properly care for or increase , and their crop yields were lower because they did not have adequate equipment and funds to operate their farm.

16.    USDA approved farm operating loans to white farmers similarly situated to Ms. Knott during the years 1994 and 1995.

17.    USDA's denial of loans to Ms. Knott was racially motivated.

7

18.    Ms. Knott complained to the Jefferson County FmHA office that she was being discriminated against on the basis of race during the years 1994 and 1995. Her complaints were ignored and were never processed, investigated or resolved.

19.    Due to circumstances beyond her control, Ms. Knott did not file a timely claim under the *Pigford* consent decree. She filed a petition under section 5(g) of the consent decree for leave to submit her claim after the October 12, 1999 deadline. The Arbitrator under the *Pigford* consent decree denied her petition.

20.    Ms. Knott seeks to have her *Pigford* claim determined under the expedited resolution process set out in section 140l2(f) of the 2008 farm bill

21.    Plaintiff and proposed class representative, Lonnie Blocker, Jr., is an African-American farmer and  resident of Moro, Lee County, Arkansas. Mr. Blocker meets the *Pigford* case class member eligibility requirements.

22.    Mr. Blocker was born and raised on a farm in Lee County, Arkansas.

23.    Mr. Blocker owned 300 acres and leased 300 acres of land in Lee County where he raised wheat  and soybeans.   In 1987, Mr. Blocker applied to the Lee County FmHA office for a farm operating loan to operate his farm. The loans were denied.

24.    USDA approved farm  operating loans to white farmers similarly situated to Mr. Blocker during the year of 1987.

25.    USDA's denial of loans to Mr. Blocker was  racially motivated.

26.    Mr. Blocker complained to the Lee  County FmHA office  that he was being discriminated against on the basis of race during the year 1987. His complaint was ignored and was never processed, investigated or resolved.

27.    Due to circumstances beyond his control, Mr. Blocker did not file a timely claim under the *Pigford* consent decree. He filed a petition under section 5(g) of the consent decree for leave to submit his

claim after the October 12,1999 deadline. The Arbitrator under the *Pigford* consent decree denied his petition.

28.    Mr. Blocker seeks to have his *Pigford* claim determined under the expedited resolution process set out in section 14012(f) of the 2008 farm bill.

29.    The defendant, Ed Schafer, is Secretary of Agriculture and head of USDA, and is the federal official responsible for the administration of the statutes, regulations, and programs that are the focus of this action.

## USDA'S AGENCIES AND PROGRAMS

30.    The FSA is an agency within USDA that administers farm loan and benefit programs for U.S. farmers. The agency was created in 1994 as a result of a reorganization of USDA that merged the FmHA, which previously had provided farm loans and other farm credit benefits, with the Agricultural Stabilization and Conservation Service ("ASCS"), which previously had handled USDA farm commodity program benefits, income support payments, and price support loans, and provided related services.

31.    FmHA had been created to provide loans, credit, and technical assistance for farmers, and FSA has continued providing these FmHA services. At all relevant times, the agency made farm loans directly to farmers or guaranteed farm loans made to farmers by other lenders. The types of FSA loans include farm ownership loans to finance the purchase of farm land; operating loans to fund on-going farm operations; emergency loans to assist farmers injured by natural disasters; economic emergency loans to assist farmers injured by adverse economic conditions; and conservation loans to finance the installation and maintenance of conserving practices on the farm. It also provides loan servicing that includes beneficial loan adjustments to enable financially-stressed borrowers to stay in operation. The agency's key function with respect to farm lending has been to provide these financial services to farmers who cannot obtain comparable credit from other sources, and to work with these farmers, including small-scale, minority, and disadvantaged farmers, in developing financial plans and loan applications.

32.     ASCS had been created to implement price support and income support payment programs for producers of grains, cotton, milk, sugar, peanuts, tobacco, wool and mohair, and honey, and to administer production control and related programs for the benefit of farmers. For many farmers, participation in ASCS program is critical for their success. FSA has continued providing these ASCS program benefits to farmers. At all relevant times, the agency made price support and marketing loans and farm program payments (including disaster payments, deficiency payments, direct payments, and marketing loan deficiency payments), and issued marketing allotments to farmers; certified farm acreages; and established farmers' acreage and yield bases.

33.     Defendant Schafer is responsible for the administration of FSA and its programs.

34.      At all relevant times, when a farmer or prospective farmer applied for a farm loan, the farmer contacted the local county FSA (and, before it, FmHA) office and prepared a loan application and a farm and home plan, which is a financial plan for the operation of the farm. The application would have to be approved by the local office's loan officer (called the "county supervisor") and the local county Farmers Home committee (which typically consists of three farmers in the county elected by local farmers).

35.     Once FSA issued a loan, the vagaries of farming might have required that loan terms be renegotiated or relaxed, or the loan forgiven, in order for the farmer to continue in operation, actions collectively referred to by the agency as "loan servicing." Federal policy has always been to provide loan servicing to FSA farm loan borrowers whenever possible to keep farmers in business and mitigate USDA lending losses. Farmers applying for loan servicing completed a farm and home plan along with their application for servicing.

36.     USDA regulations require that FSA offer all farmers, especially those who qualify as socially disadvantaged (including African-American farmers), technical assistance (*i.e.*, extra help) in the completion of farm loan program application forms, and farm and home plans. Assistance and guidance typically were critical for the approval of the application because of the complexity of the programs and

forms.

37.     The Equal Credit Opportunity Act ("ECOA") prohibits discrimination in credit transactions based on race or other factors. 15 U.S.C. §1691(a). In addition, USDA has codified regulations, 7 C.F.R. Part 15, that state USDA's policy of nondiscrimination in federally assisted and conducted programs. If a farm loan or loan servicing was denied on discriminatory grounds, the farmer could file a complaint with the Secretary of Agriculture, FSA, or the USDA Office of Civil Rights ("OCR") and its predecessor offices within USDA.

38.     At all relevant times, when a farmer or prospective farmer applied for a farm price support or payment program benefits, the farmer contacted the local FSA (and, before it, ASCS) office and submitted documentation to verify his or her qualification for the program benefit. The application would have to be approved by the local office's county executive director and the local county ASC committee (which typically consists of three farmers in the county elected by local farmers).

39.     The Administrative Procedure Act ("AP A") prohibits actions by USDA officials in the operation of the farm benefit programs that are arbitrary, capricious, or not otherwise in accord with the law (5 U.S.C. § 706), such as discrimination in farm program transactions based on race or other factors. In addition, the 7 C.P.R. Part 15 policy of nondiscrimination in federally assisted and conducted programs applies to ASCS-type benefit programs as well as to FSA's loan programs. If a farm program benefit was denied on discriminatory grounds, the farmer could file a complaint with the Secretary of Agriculture, FSA, or OCR and its predecessor offices within USDA.

40.     The Commodity Credit Corporation (the "CCC") is an entity within USDA, established under authority of the Commodity Credit Corporation Charter Act. 15 U.S.C. § 714 et seq. The defendant is the chairman of the CCC and all of its officials are subordinates of the defendant The Corporation provides support for USDA's farm benefit programs and foreign agricultural programs.

41.     The CCC has Treasury borrowing authority (15 D.S.C. § 714b(i)) and does not need

advance authorization through appropriations statutes for disbursal, as directed by statute, of funds obtained through its borrowing authority. The $100,000,000 provided for section 14012 claimants is now fully available for disbursement to successful claimants.

<u>**DOCUMENTATION OF USDA CIVIL RIGHTS VIOLATIONS**</u>

42.     In the 1990s, evidence came to light that there were substantial concerns of racial discrimination by FSA in the operation of its farm loan and benefit programs, and that USDA's system of investigating and resolving complaints of discrimination was severely dysfunctional.

43.     USDA established the Civil Rights Action Team ("CRAT") in 1996 to investigate concerns about discrimination in the operation of USDA's farm loan and benefit programs. In February of 1997, after the conduct of numerous listening sessions with minority farmers and others, the Civil Rights Action Team issued a report (the "CRAT Report") detailing the scope and the types of discrimination that minority farmers were facing in dealing with USDA farm programs and personnel. The Civil Rights Action Team described perceptions of neglect of and bias against minorities by USDA that caused a loss of farmers' land and income. It reported systematic mistreatment of minority farmers at FSA and found a lack of resources at USDA to ensure fair and equitable (non-discriminatory) program delivery to farmers.

44.     The CRAT Report found lower participation rates and lower loan approval rates for minorities in FSA programs. CRAT Report at 21.  Moreover, even where loans or benefits eventually were approved, as the CRAT Report found, minorities endured longer processing times. "In the Southeast, for example, in several States it took three times as long on average to process African-American loan applications as it did non minority applications. *Id*. The pattern of African Americans receiving less assistance is consistent throughout the country and throughout the class period.

45.     In the implementation of FSA loan programs during all relevant times, loan applications were subject to a two-step approval process. First, the county committee had to determine the

12

applicant's eligibility; then, the county supervisor evaluated the merits of the application and either approved or rejected it.

46.     The criteria that the committee and supervisor were instructed to rely on to assess loan applications were uniform across the United States, but the criteria for the committees and the guidelines for applying them were susceptible to multiple interpretations by individual committees. Further, the supervisor's evaluation process was highly subjective. The supervisor decided whether to approve or reject the application based upon whether the applicant had adequate security and whether the farm and home plan was "feasible," that is, it demonstrated a  positive cash flow. The latter process also required in the loan servicing application process was rife with variables susceptible to multiple interpretations by the supervisor. The use of these and other, similarly subjective criteria to detem1ine eligibility for loans and loan servicing has allowed discrimination against African-American farmers to flourish, and has led to and ratified a pattern and practice of discrimination against African-Americans in the provision of direct loans and loan servicing.

47.     In addition, the use of subjective criteria to determine eligibility for loans and loan servicing has had an adverse impact on the ability of African American farmers to obtain direct loans and loan servicing that cannot be reconciled with USDA's legitimate operational needs.

48.     USDA also has engaged in a pattern and practice of denying African Americans equal access to direct loan and benefit applications that it provided to farmers, and therefore to loans or benefits, thereby systematically disadvantaging African American farmers in the application process. African-American farmers routinely were not advised of the availability of USDA loans and loan servicing, or other program benefit, options; were not provided applications upon request; and were not provided adequate technical assistance to enable them to complete the loan and loan servicing application process, while other farmers were routinely provided these benefits and opportunities

49.     In addition, USDA officials regularly erected a variety of barriers that prevented African-Americans from receiving loans and loan servicing or other benefits, or delayed or reduced the value

of any loan or loan servicing, or benefit, received. These obstacles were not imposed on white farmers.

50.     Notwithstanding that USDA has been on notice that its loan and loan servicing processing has consistently disadvantaged African-American farmers, the agency has failed to redress the inequities its policies have caused or to correct the flawed policies themselves. The CRAT Report stated, "[c]urrently, the Farm and Foreign Agricultural Services (FFAS) Mission Area, which manages the FSA program delivery system, provided ineffective oversight of the local delivery of farm credit services."*Id.* at 16.

51.     As the CRAT Report's findings indicate, USDA's failure to redress the inequities in the delivery of services to minorities has been due, at least in part, to the low priority that the USDA has placed on compliance with the civil rights laws. *Id*. at 55.

52.     In May 1997, it was learned that, unbeknownst to section 14012 claimants and other *Pigford* case class members, the enforcement capability of USDA's civil rights enforcement staff was severely curtailed in 1983, leaving USDA with virtually no ability to investigate discrimination complaints. In a May 25, 1997, Richmond News Dispatch article and interview of Lloyd Wright, then Director of USDA's Office of Civil Rights, Mr. Wright stated that no systematic probes or investigations into farmer allegations of discrimination in the administration of USDA loan programs had been conducted since 1983, when the civil right investigative staff was disbanded, and that program regulations and other civil rights laws had been violated.

53.     Further documentation of USDA's willful failure to investigate discrimination complaints was the February 27, 1997, USDA Office of Inspector General report on civil rights issues at USDA ("1997 OIG Report"), first of a series of OIG reports on the matter. The 1997 OIG Report found that FSA and one of OCR's predecessors, the Office of Operations, Civil Rights Enforcement and Adjudication, failed to conduct civil rights investigations or otherwise follow proper investigative procedures. *Id.* at 1-2. The report indicated that the discrimination complaint process within FSA lacked integrity and accountability, was without at tracking system, was in disorder, did not resolve discrimination complaints, and had a massive

backlog. *Id.* at 6.

54.    The Civil Rights Action Team's Report similarly condemned USDA's lack of civil rights enforcement and accountability as one cause of the drastic decline in the number of African-American farmers in the United States since the first part of the last century. The CRAT Report noted that "the number of all minority farms has fallen--from 950,000 in 1920 to around 60,000 in 1992. For African-Americans, the number fell from 925,000, 14 percent of all farmers, in 1920, to only 18,000,1 percent of all farms, in 1992." CRAT Report at 14.

55.    USDA admitted in the GRAT Report that its record-keeping on discrimination complaints was "non-existent," that a backlog existed, and that the largest number of complaints against any single USDA agency was against FSA. *Id*. 24-25.

56.    Even after the *Pigford* case was settled and a consent decree implementing the settlement was issued on April 14, 1999, government reports have continued to excoriate USDA for its failure to adequately investigate and resolve discrimination complaints of farmers and others.

57.    On March 10,2000, the Office of Inspector General issued phase VII of its series of reports on civil rights issues at USDA, entitled "Office of Civil Rights Status of the Implementation of Recommendations Made in Prior Evaluations of Program Complaints--Phase VII" ("OIG Report VII"). The report ac1mowledged that the Office of Civil Rights' processing of civil rights complaints remained flawed. "This is our *seventh* attempt to provide [OCR] with constructive ways to overcome its inefficiencies. Based on the results of our review and on the operating environment we observed at [OCR], we cannot report encouraging news." OIG Report VII, Viadero cover letter at 1 (emphasis in original).

58.    In a report issued on February 23,2003, the U.S. Equal Employment Opportunity Commission found that USDA still failed adequately to address complaints of discrimination.

59.    On May 14, 2008, tbe Government Accountability Office issued a report entitled "U.S. Department of Agriculture: Management of Civil Rights Efforts Continues to Be Deficient Despite Years

of Attention" (the "GAO Report"). The report catalogues USDA's continuing failure to process civil rights complaints, GAO Report at 8, and its misrepresentations of the numbers of complaints that have been resolved. *Id*. at 9-10. The report also ties the failures of USDA's civil rights office to the agency's failure to provide service on an equal basis to minority farmers and ranchers. The report notes that while the civil rights office has "articulated a compelling strategic goal— to ensure USDA provides fair and equitable services to all customers and upholds the civil rights of its employees— its implementation will require further development." *Id*. at 5.

## THE *PIGFORD* CASE AND CONSENT DECREE

60.    Following the release of information documenting USDA's culpability for civil rights violations, the *Pigford* case was filed on August 28, 1997. It alleged that (a) FSA, when processing applications of African-American farmers for farm loan and other programs, willfully discriminated against them, and (b) when, in response, the *Pigford* case plaintiffs filed discrimination complaints with USDA, the agency failed to account for, investigate, process, and resolve the complaints although required by law to do so. The combined effect of the USDA discrimination in the denial of farm loan and other program benefits and the failure to properly investigate and resolve the discrimination complaints deprived the African-American farmers of equal and fair access to the farm loan and other programs, and due process, resulting in harm to them.

61.    On October 9, 1998, the court in the *Pigford* case issued an Order certifying the class under Rule 23(b)(2) of the Federal Rules of Civil Procedure ("FRCP") for purposes of determining liability. The Order stated that "the plaintiffs have established that they meet the requirements for class certification under Rule 23(a) of the Federal Rules of Civil Procedure," ,and it defined the *Pigford* class as follows:

> All African-American farmers who (1) farmed between January 1, 1983, and February 21, 1997; and (2) applied, during that time period, for participation in a federal farm program with USDA, and as a direct result of a determination by USDA in response to said application, believed that they were discriminated against on the basis of race, and filed a written discrimination complaint with

USDA in that time period.

62.     To facilitate the prosecution of the class claims in the *Pigford* case, given that many class members' allegations of wrong-doings extended back beyond the limitations provisions of ECOA and the APA, the Omnibus Consolidated Appropriations Act of Fiscal Year 1999 (P.L. 105-277, Div. A, § 101(a) [ § 741], 112 Stat. 2681, 7 U.S.C. § 2279 note, enacted on October 21, 1998) waived the statute of limitations for persons who filed with USDA before July 1, 1997, complaints of discrimination by that agency in the operation of its farm programs during the period January 1, 1981, and December 31, 1996.

63.     By Order of January 5, 1999, upon motion of the parties, the Court vacated the original class certification Order and certified the *Pigford* class pursuant to FRCP Rule 23(b)(3).

64.     The *Pigford* case was settled and a consent decree to implement the settlement was approved on April 14, 1999. Class counsel under the consent decree, as amended on December 22,2000 and June 19,2006, are the same counsel who represent the plaintiffs in this action.

65.     The consent decree restated the definition of the *Pigford* class as,

> All African American farmers who (1) farmed, or attempted to farm, between January 1, 1981 and December 31, 1996; (2) applied to the United States Department of Agriculture (USDA) during that time period for participation in a federal farm credit or benefit program and who believed that they were discriminated against on the basis of race in USDA's response to that application; and (3) filed a discrimination complaint on or before July 1, 1997, regarding USDA's treatment of such farm credit or benefit application. *Pigford* consent decree, at 5-6.

The restatement retained the substance of the class definition established by the court when it certified the class on October 9, 1998, revising it merely to confirm its dates to those set out in the statute of limitations waiver and to include persons who attempted to farm.

66.     Under the consent decree, the benefit received by members of the *Pigford* class was the right to have their previously-ignored or improperly processed discrimination complaints resolved under adjudicatory procedures designed to facilitate rapid and fair resolutions of what, in many cases, were claims

17

stretching back ten years or longer. To participate in this beneficial adjudicatory procedure, each *Pigford* class member was required to file a claim form on or before October 12, 1999, along with documentary proof that he or she met the third prong of the class definition– that the person "filed a discrimination complaint on or before July 1, 1997, regarding USDA's treatment of such farm credit or benefit application."

67.    In filling out the claim form, the *Pigford* class member elected which of two adjudicatory procedures to follow, 'Track A or Track B. If the *Pigford* class member chose Track A, the claim form (a) documented how he or she met the first two prongs of the class definition—(i) that he or she farmed or attempted to farm, and (ii) that he or she applied for a benefit and believed he or she was discriminated against in USDA's response to the application and (b) otherwise stated the proof of his or her allegations of discrimination.

68.    By choosing Track A, a *Pigford* class member effectively agreed to accept liquidated damages ($50,000 in cash, $12,500 paid to the Internal Revenue Service to apply to taxes due on the damages, cancellation of debt tainted by the discrimination, and an amount equal to 25 percent of the principal of any debt canceled paid to the Intemal Revenue Service to apply to taxes due of the principal canceled) and injunctive relief designed to facilitate the claimant's participation in USDA fann loan programs. Also, the claimant agreed to a truncated adjudicatory procedure consisting of a review of the claim form, and any written reply and documentation submitted by USDA in response to the claim, by an Adjudicator appointed under the consent decree applying a "substantial evidence" burden of proof.

69.    Section 1(1) of the Pigford consent decree contains the definition of the term "substantial evidence" as used in the consent decree and section 14012 of the 2008 farm bill, which reads as follows:

> (1) The term "substantial evidence" shall mean such relevant evidence as appears in the record before the adjudicator that a reasonable person might accept as adequate to support a conclusion after taking into aCCQ\mt other evidence in the record that fairly detracts from that conclusion. Substantial evidence is a lower standard of proof than preponderance of the evidence.

70.    If a class member chose Track B, the person was entitled to an arbitration hearing on his

or her claim lmder procedures set out in the consent decree designed to provide a resolution of the matter within six months. Under Track B, there was no limit on the amount of damages that could be awarded, but the claimant's burden of proof was the "preponderance of the evidence" standard normally applicable to federal court litigation.

71.    22,712 individuals who applied to file claims under the *Pigford* consent decree were determined to be eligible class members. Of these, 22,540 (more than 99 percent) elected Track A, while 172 elected Track B. 15,432 of the Track A claimants (69 percent) have prevailed, with several hundred still pending.

72.    Section 5(g) of the *Pigford* consent decree provided that a person who meets the *Pigford* class definition, i.e., a *Pigford* class member, who failed to submit a completed claim package by October 12, 1999, had the right to petition the Court to pennit the person to participate in the Track A or B claims process. A petition could be granted only if the person demonstrated that his or her failure to submit a timely claim was due to extraordinary circumstance beyond his or her control. The Court later issued an Order on December 20, 1999 delegating to the Arbitrator under the consent decree the responsibility of reviewing and deciding section 5(g) petitions. And, the Court issued an Order on July 14, 2000 making any late filing petition mailed after September 15, 2000 ineligible for section 5(g) consideration.

73.    The Arbitrator reviewed 65,991 section 5(g) petitions from class members received on or before September 15, 2000. He approved 2,699 petitions, and claim fonns were sent to those class members. The other 63,292 petitions were rejected; and, thus, *Pigford* class members among that group have not been able to file claims under the *Pigford* consent decree. These are the persons to which section 14012 of the 2008 farm bill applies.

74.    According to statistics compiled by the Claims Facilitator under the *Pigford* consent decree, of the 2,699 persons permitted by the Arbitrator to submit late claim forms, 71 percent filed claims and were determined to be eligible class members under the consent decree.

### *PIGFORD* LATE FILER LEGISLATION

75.    Congress held hearings in 2004 and 2007 on the status of section 5(g) late filer petitions and the reasons why persons did not submit timely claim fonns, and detennined it appropriate that all section 5(g) petitioners who are *Pigford* class members and who were not granted permission by the Arbitrator to submit claim forms late be given another opportunity to pursue a resolution of their *Pigford* claims. This led to the enactment of section 14012 as part of the 2008 farm bill giving each such person the right to have a determination made on his or her *Pigford* claim in a civil action brought in this Court. Sec. 14012(b).

76.    Subsection (i)(1) of section 14012 provides $100,000,000 of the funds of the Commodity Credit Corporation for provision of monetary relief to section 14012, and designates the defendant as responsible for making the funds available for that purpose.

77.    Subsection (f) of section 14012 provides to persons filing actions under the section the right to have their claims adjudicated under an expedited resolution process. It states as follows:

(f) EXPEDITED RESOLUTIONS AUTHORIZED.,—
  (1) IN GENERAL·· Any person filing a complaint under this section for discrimination in the application for, or making or servicing of, a farm loan, at the discretion of the person, may seek liquidated damages of $50,000, discharge of the debt that was incurred under, or affected by, the 1 or more programs that were the subject of the I or more discrimination claims that are the subject of the person's complaint, and a tax payment in the amount equal to 25 percent of the liquidated damages and loan principal discharged, in which case—
        (A) if only such damages, debt discharge, and tax payment are sought, the complainant shall be able to prove the case of the complainant by substantial evidence (as defined in section 1(1) of the [*Pigford* case] consent decree); and
        (B) the coilli shan decide the case based on a review of documents submitted by the complainant and defendant relevant to the issues of liability and damages
  (2) NONCREDIT CLAIMS.—
        (A) STANDARD.— In any case in which a claimant asserts a noncredit claim under a benefit program of the Department, the court shall determine the merits of the claim in accordance with section 9(b )(I) of the consent decree.
        (B) RELIEF.— A claimant who prevails on a claim of discrimination Involving a noncredit benefit program of the Department shall be entitled to a payment by the Department in a total amount of $3,000, without regard to the number of such claims on which the claimant

20

prevails.

The Expedited Resolution process and reliefunder section 14012(f) mirrors the Track A process under the *Pigford* consent decree, except that the consent decree also made certain injunctive relief available to successful Track A claimants.

78.    Based on *Pigford* case statistics on the results for section 5(g) petitioners who did file late claims following approval by the *Pigford* case arbitrator, it is reasonable to expect that 71 percent of the 63,292 section 14012 claimants will file claims and will be determined eligible to pursue then- claims.

79.    Based on Pigford case statistics on the number of Track A and Track B claims filed under the *Pigford* consent decree, it is reasonable to conclude that 99 percent of the section 14012 claimants who file claims will seek relief under the Expedited Resolution provision in section 14012(f), an estimated 44,000 claims.

80.    Based on *Pigford* case statistics on section 5(g) successful v. unsuccessful Track A claims, it is reasonable to conclude that successful Expedited Resolution claimants cumulatively will be entitled to substantially more than $100,000,000. This limited fund is adequate to provide compensation and tax benefits to only 1,600 section 14012 claimants, without regard to any debt relief that might be granted to successful claimants.

## CLASS ACTION ALLEGATIONS

81.    Plaintiffs bring this action on behalf of an section 14012 claimants who–

(a) meet the class definition in the Pigford case:

All African American farmers who (1) farmed, or attempted to farm, between January 1, 1981 and December 31, 1996; (2) applied to the United States Department of Agriculture (USDA) during that time period for participation in a federal fann credit or benefit program and who believed that they were discriminated against on the basis of race in USDA's response to that application; and (3) filed a discrimination complaint on or before July 1, 1997, regarding USDA's treatment of such farm credit or benefit application.

(b) did not file a Pigford claim before the sign-up period expired on October 12,

1999; and

(c) later petitioned on or before October 15, 2000, to be given the right to participate even though they missed the deadline, but whose petitions were denied.

82. With the exception of the "late filing" requirements set out in subparagraphs (b) and (c.) in paragraph 102, this class as defined was certified by the Court in the *Pigford* case.

104. This action is brought and properly may be maintained as a class action pursuant to the provisions of Rules 23(a)(1 )-(4) and, as appropriate, 23(b)(1) or (b)(3) of the Federal Rules of Civil Procedure. This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

83. The class is so numerous that the individual joinder of all its members is impracticable. There are 63,292 unsuccessful late filers whose petitions were denied by the Arbitrator. If only one-third of them seek relief under section 14012, they would number more than 21,000, and 99 percent of that number would opt for section 14012(f) expedited resolution.

84. In its Order of October 9, 1998, in the *Pigford* case, the Court ruled that common questions of law and fact exist as to the members of the *Pigford* case class and predominate over any questions affecting only individual members of that class. Because the class in this case is identically defined as the class in the *Pigford* case, save for the purely procedural requirements applicable to the class under section 14012, the Court's class certification Order in *Pigford* has applicability to this case.

The common questions of law and fact applicable to this class include but are not limited to the following:

(a) Whether USDA's complete failure to properly account for, investigate, process, and resolve plaintiffs' and class members' complaints of discrimination, following on the acts of disclimination themselves, harm the class. The issue of whether this is a common question of law or facts was decided by this Court in the Court's October 9, 1998, ruling on class certification in the *Pigford* case, and the defendant

22

is bound by the principle of issue preclusion from contesting that ruling in this action.

(b)    Whether defendant's agency discriminated against plaintiffs and class members in granting credit and other farm program benefits.

(c)    Whether defendant's agency failed to provide plaintiffs and class members equal opportunity for and access to credit and other farm program benefits.

(d)    Whether defendant's agency's actions violated plaintiffs' and class members' rights under ECOA or the AP A.

(e)    Whether the limited flmd of $100,000,000 made available for damages under section 14012 is severely inadequate to pay all successful claimants and, if so, how should it equitably be disbursed among the claimants.

(f)    Whether plaintiffs and class members are entitled to monetary relief and attorney's fees.

85.    Plaintiffs' claims are typical of the claims of the members of the class. Plaintiffs and the members of the class are class members in the *Pigford* case; were subject to defendant's failure to properly investigate civil rights complaints; and were denied equal access to USDA's farm loan and benefit programs as a result of defendant's discriminatory conduct described herein. In addition, the plaintiffs share the same interest as absent class members in securing an equitable distribution ofthe limited fund of $100,000,000 made available for successful section

14012 claimants and in basing their c1aims for relief on the same legal and remedial theories that absent class members might raise.

86.    Plaintiffs are adequate representatives of the class because they are members of the class and their interests do not conflict with the interests of the class they seek to represent. Plaintiffs' counsel, who are the class counsel under the *Pigford* consent decree, are experienced in the prosecution of complex agricultural disputes against USDA on behalf of farmers, experienced in civil rights litigation, and experienced in class action litigation. By reason of their status as class counsel in *Pigford*, plaintiffs' counsel

are even now class counsel to the section 14012 claimants who satisfy the *Pigford* class definition. Plaintiffs' counsel has represented and continues to represent many of these class members on an individual basis in their efforts to obtain benefits under the consent decree.

87.    The various claims asserted in this action are certifiable under the provisions of FRCP Rule 23(b )(l)(B) because the prosecution of separate actions by individual class members would create a risk of adjudications that would, as a practical matter, be dispositive of the interests of the other class members not parties to such adjudications or would substantially impair or impede the ability of such non-party class members to protect their interests. If liquidated damages of $50,000 and tax payments of $12,500 are paid in full (as provided in section 14012(f)(1)) as each claim is resolved, then the limited fund of $100,000,000 will be exhausted after only 1,600 claimants have been paid and thousands of claimants coming later will receive no compensation at all.

88.    Alternatively, a class action certifiable under tbe provIsIOns of FRCP Rule 23(b)(3) is superior to otber available methods for the fair and efficient adjudication of this action since individual litigation of class members' claims regarding USDA's deprivation of their civil rights as described in this Complaint is impracticable. Even if any class member could afford to litigate, it would be unduly burdensome to the Court to litigate each individual case.  Individual litigation further presents a potential for inconsistent or contradictory judgments and increases the delay and expenses to all parties and the court system in resolving the legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication of what essentially is one problem, economies of scale, and comprehensive supervision by a single court. Notice of the pendency of any resolution of this class action can be provided to class members directly hy mail and telephone.

## COUNTS

### COUNT I
**(Declaratory judgment)**

24

89.     Plaintiffs, on behalf of themselves and all others similarly situated, re-allege all the paragraphs above as if fully set forth herein.

90.     An actual controversy exists between plaintiffs and class members and defendant as to the plaintiffs' and class members' rights with respect to defendant's farm loan and benefit programs.

91.     Plaintiffs and class members pray that the Court declare and determine, pursuant to 28 U.S.C. § 2201, that USDA has violated their rights to equal credit, to equal participation in farm loan and benefit programs, and to timely and full enforcement of their racial discrimination complaints.

## COUNT II
### (Violation of Equal Credit Opportunity Act)

92.     Plaintiffs, on behalf of themselves and all others similarly situated, re-allege all the paragraphs above as if fully set forth herein.

93.     USDA's acts of denying plaintiffs and class members farm loans and related services and failing to properly account for, investigate, process, and resolve their discrimination complaints was racial discrimination and contrary to the requirements of the Equal Credit Opportunity Act, 15 U.S.C. § 1691(a).

94.     Plaintiffs and class members are entitled to damages under section 14012 of the 2008 farm bill for such acts committed against them.

## COUNT III
### (Violation of Administrative Procedure Act)

95.     Plaintiffs, on behalf of themselves and all others similarly situated, re-allege all the paragraphs above as if fully set forth herein.

96.     USDA's acts of denying plaintiffs and class members farm program benefits and failing to properly account for, investigate, process, and resolve their discrimination complaints was racial discrimination and contrary to the requirements of the APA.

97.     Plaintiffs and class members are entitled to damages under section 14012 of the 2008 farm bill for such acts committed against them.

## Prayer for Relief

25

Wherefore, plaintiffs respectfully request this Court to:

1.    provide them and class members with a determination of their claims under section 14012of the 2008 farm bill;

2.    enter judgment in favor of plaintiffs and class members with credit claims finding that USDA discriminated against them in the farm loan and loan servicing process, and award them damages;

3.    enter judgment in favor of the plaintiffs and class members with noncredit claims finding that USDA discriminated against them in the award and delivery of farm program benefits, and award them damages of $3,000;

4.    enter an appropriate Order to preserve the $100,000,000 available under subsection (i)(1) of section 14012 until the claims of all the plaintiffs and class members are adjudicated and the total amount of damages is determined;

5.    enter an appropriate Order allocating the $100,000,000 among all plaintiffs and class members who are awarded dan1ages on a fair and equitable pro rata basis;

6.    award attorney's fees, costs, and expenses to plaintiffs' counsel pursuant to ECOA and the Equal Access to Justice Act; and

7.    award such other relief as the Court might deem equitable, necessary, and proper.

Respectfully submitted,

_____/s/_____
Othello C. Cross Ark. Bar#79044
Jesse L. Kearney Ark Bar#76062
Cross & Kearney, PLLC
1022 W. 6th Avenue
Pine Bluff, AR 71601
(870) 536-4056
(870) 536-0216 (fax)

Date: August 22, 2008

26

08-1513
PLF

# CIVIL COVER SHEET

JS-44
(Rev.1/05 DC)

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| JEREMIAH ROBINSON, et al        88886 | ED SCHAFER, United States Department of Agriculture |

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF    Jefferson County
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Cross & Kearney, PLLC
1022 W. 6th Avenue
Pine Bluff, AR 71601
(870) 536-4056

Case: 1:08-cv-01513
Assigned To : Friedman, Paul L.
Assign. Date : 8/25/2008
Description: Civil Rights-Non-Employ.

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

O 1 U.S. Government Plaintiff

O 3 Federal Question
(U.S. Government Not a Party)

◉ 2 U.S. Government Defendant

O 4 Diversity
(Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX
FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) FOR DIVERSITY CASES ONLY!

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | O 1 | O 1 | Incorporated or Principal Place of Business in This State | O 4 | O 4 |
| Citizen of Another State | O 2 | O 2 | Incorporated and Principal Place of Business in Another State | O 5 | O 5 |
| Citizen or Subject of a Foreign Country | O 3 | O 3 | Foreign Nation | O 6 | O 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

**O A. Antitrust**

☐ 410 Antitrust

**O B. Personal Injury/ Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

**O C. Administrative Agency Review**

☐ 151 Medicare Act

Social Security:
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)
Other Statutes
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

**O D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

**O E. General Civil (Other)**    OR    **O F. Pro Se General Civil**

Real Property
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

Personal Property
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

Bankruptcy
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

Prisoner Petitions
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

Property Rights
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

Federal Tax Suits
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

Forfeiture/Penalty
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

Other Statutes
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

1OT  USA
1OT  USAG

| ○ **G. Habeas Corpus/ 2255** | ○ **H. Employment Discrimination** | ○ **I. FOIA/PRIVACY ACT** | ○ **J. Student Loan** |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment<br>(criteria: race, gender/sex,<br>national origin,<br>discrimination, disability<br>age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions<br>(if Privacy Act)<br><br><br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted<br>Student Loans<br>(excluding veterans) |

| ○ **K. Labor/ERISA (non-employment)** | ⊗ **L. Other Civil Rights (non-employment)** | ○ **M. Contract** | ○ **N. Three-Judge Court** |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting &<br>Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights<br>Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☒ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-<br>Employment<br>☐ 446 Americans w/Disabilities-<br>Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment &<br>Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of<br>Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting<br>(if Voting Rights Act) |

**V. ORIGIN**

⊗ 1 Original Proceeding  ○ 2 Removed from State Court  ○ 3 Remanded from Appellate Court  ○ 4 Reinstated or Reopened  ○ 5 Transferred from another district (specify)  ○ 6 Multi district Litigation  ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)**
Violation of Equal Credit Opportunity Act 15 U. S. C. sec 1691(a) and APA U. S. C. sec 706

| **VII. REQUESTED IN COMPLAINT** | ☒ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 | DEMAND $ [_____] Check YES only if demanded in complaint<br>JURY DEMAND: YES ☐ NO ☒ |
|---|---|---|

**VIII. RELATED CASE(S) IF ANY**  (See instruction)   YES ☒   NO ☐   If yes, please complete related case form.

DATE 08/22/2008 *25*    SIGNATURE OF ATTORNEY OF RECORD    *Not Signed*

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.   CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.   CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.   CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.  RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.